Derek Tallarico appearing for Appellant, Paul Jasper appearing for the Official Committee of Unsecured Creditors, and Joshua Siegel appearing for Bakery and Confectionary Union Industrial Pension Fund. Okay, Mr. Tallarico, I'm going to turn to you first for just to confirm maybe a little bit of choreography here. My understanding, well, we had indicated, we thought it was appropriate that if the committee were to speak today, they would speak in conjunction with your presentation. So we think that makes some sense. I think I had heard from the clerk that you had asked to reserve six minutes for rebuttal and that you would allocate some time to committee's counsel within that six minutes. Is that accurate? Yeah, let's not make it too quirky. Let's just say 10 minutes initially and five for rebuttal. Well, I mean, I'm responding to your quirk, so you tell me what you want to do. Yes, let's do 10 minutes initially and then five for rebuttal, of which Mr. Jasper will have two. All right, so Mr. Jasper will not be speaking during your initial 10 minutes. Correct. Got it. Okay. You may proceed. Thank you. The appeal here, I really can't underestimate what I feel is a dangerous impact the bankruptcy court's ruling has had on assignment and assumption in the Ninth Circuit. The holding of the case is a dramatic departure from how contracts have been assumed by debtors with a devastating impact on their ability to reorganize. In sum, the bankruptcy court held that in order to assume a contract, it is no longer sufficient that at the time of bankruptcy, both sides had unperformed obligations, the failure of which to perform would constitute material breach of the contract, the countryman definition we're all familiar with. Now, for a contract to be assumable, there must be material unperformed obligations at the time of the bankruptcy that are simultaneously due to be performed at that time of bankruptcy. So any order or sequence to performance would now be fatal to the assumption of a contract. So how did the bankruptcy court get it wrong in this sense? And I think that starts with the framing of the question the court sought to answer, which was derived from a misunderstanding and misapplication of the law set forth in Helms by the Ninth Circuit. The bankruptcy court states that whether the contract is executory turns on whether the release to be given by the pension fund is contingent upon full payment by Svenhards. The bankruptcy court answers this question in the negative on the basis that because the release follows the payment, therefore, at the moment of bankruptcy, there was no performance due by the pension fund, so no mutual balance. So, counsel, let's cut to the chase and help me understand how the failure of the pension fund to provide the release excuses the performance that is required of the debtor to make full payment of both the withdrawal liability and the contribution liability. Can you help me get to that point? Yes, so I think that operates on two levels. One, in general, these type of contracts where releases are given and the only obligations to give a release have traditionally been held to be executory contracts because – I'm sorry. That's not true. I mean you cited to us the case of Enrique Columbia Gas, and that's a Third Circuit case where the court said that the parties seemed to agree that if the case involved a simple exchange of money for the execution of a release of all claims, there would be no question the contract would not be executory. It goes on to say, no failure on the part of class members to execute a release under the settlement could have created a material breach of the contract. Rather, the releases were a condition for each member to get a share of the settlement. How is that different in our case? So for two reasons. One, in Columbia Gas, giving the release was akin to an option. It was for class action members to opt in to the settlement. They didn't have to give releases, but if they wanted to get the settlement, they could elect the option of giving the release. I appreciate that portion of the decision is different and more like an option, but deal with the language that says the parties agree that if the case involved a simple exchange of money for the execution of a release of all claims, there would be no question the contract would not be executory. Not every contract that requires a release at the end is an executory agreement, is it? Or is that what your decision would have us hold, that every contract that requires a release is by virtue of its two parties have two obligations, that makes it executory? So in this case, that would not be required holding by the terms of this contract. And this is a point that I think the bankruptcy court misses, is this contract had two streams of payments. They both started at the same time, and one payment ended in three years' time. And at that point, release number one was required to be given. And thereafter, stream of payments two continued for another 15 years. And when they were concluded, release number two had to be granted. So in our contract, if release number one was not given midway through performance, that would be a breach. It would be a breach, and the implication would be that… somehow then be excused, and you would never have to pay the $3 million. Because they didn't give you the release for the contribution liability, your position is that that excuses your performance of the other to get the release for the withdrawal liability. They aren't two separate liabilities. They're, in fact, tied together by virtue of this settlement agreement, and that makes the contract executory. Is that a fair statement? I think it is, but I don't think it's as problematic as Your Honor may envision. At that point, if the first release isn't given, that is a material breach. And now it may very well be that Svenhars decides, you know, okay, what's my remedy there? Do I go to court, get specific performance? Do I say this whole thing's blown up? I think they could say this whole thing is blown up now. I no longer have to perform. But what's the downside of that? What's the downside of that? They then reinstate the $39 million liability? They don't get the benefit of the settlement that they entered into? Does that make economic sense? Would they ever do that? The answer practically is probably no, but this still was a settlement on a disputed claim. And the fact of the breach of the settlement could have implications. What was the dispute other than we can't pay it? Sorry? What was the dispute other than we don't think we can pay it? The amount wasn't in dispute. Yeah. I mean your ability to pay it was in dispute. Fair enough. I mean I think the union will tell us there's another dispute that they want to get to in a different court. We're not going to – I don't expect you to bring that up. I expect them to. But what was the dispute other than we can't afford this? There wasn't one, so thank you. I was not involved in that, but I believe that the major driver was ability to pay. But I don't think the Spinhards ever conceded until they signed – yes, they signed a contract. They said, hey, we have – this is the amount due. I mean that's the nature of signing a contract. They had the ability to appeal the assessments when they were made, and they didn't appeal, and that became a final determination. They owed the money irrespective of anything else about their ability to pay. They had no dispute as to the liability and the amount of the debt, right? That was established. That was what was admitted in the contract when it was signed. Whether there was question as to whether all the procedure had been properly followed such that it was immutable, that there was any defense, that I don't know the answer to, and I don't think is necessary to – I mean the fact is they did sign and say, hey, this is all due. But that was part of a settlement. It was a settlement agreement. So then don't we just come back to the fact that there's, you know, one party has an obligation to pay money and the other party has an obligation to provide – or there's a release. They get a release. Yes. And so that then seems like it's similar to the language that Judge Gann quoted from the Columbia gas case, which says not executory. I guess my question is, are you like creating like a blanket rule the other way? You say that, you know, Judge Klein created this blanket rule that says if the obligations are not simultaneous, you know, then it can never be an executory contract. You're saying no matter what, you know, a settlement agreement is an executory contract because one party performs and then the other party performs later is always an executory contract? Is that what you're saying? As with many cases, you know, it comes down to case by case. But as a general maxim, that is the more popular and I believe better rule than saying hard line no. There are plenty of cases that hold that a settlement agreement where there are only a release due at the end is an executory contract. There's cases both ways. I admit that. Go ahead. I'm sorry, Judge Brantley. I was going to say, really, it's actually I think the real key is what you said. It's a case by case analysis. So it doesn't matter whether the payment is simultaneous or later. What we have to look at is whether there's performance due, whatever it is on both sides. Isn't that really what we're looking at? Yes, I entirely agree with that. But more important than performance, it's that the lack and the failure of the other party to perform excuses your performance. That's what's really required here. And that's what's at the heart of the Wagner and if you look at tax scan, another Ninth Circuit decision. You look at Helms. They all turn on the question not only is performance required, but if the failure to perform would constitute a material breach that would excuse the other party's performance. That's what I'm struggling with here. You've tried to suggest to me that if they don't give a release, then they get the benefit of not paying the money. Sure, they don't have to pay. But how is that going to – how does that ever make economic sense? I don't see that. In this situation, it probably doesn't make economic sense considering the implications of not doing so. But that's to be determined with whether Spenharts decides I'm better off because there could be a – whatever court process I go to or I force pension fund to go to, I will be better off and could end up paying less. That's a decision case by case for them to make. I agree with you. They probably don't make that decision, but they could. Okay. Well, you're about at three and a half. Shall we pause now and reserve the rest for rebuttal? Yes. Okay. Thank you. All right. Mr. Siegel, I believe it is, right? Yes, sir. Good morning. My name is Josh Siegel, appearing on behalf of Affiliate Pension Fund. May it please the Court, on the decision being appealed here, Judge Klein identified no less than three separate and entirely independent bases to reject Spenharts' motion to assume the agreement with the pension fund and assign it to a third-party United States bakery or USB. To prevail on this appeal and reverse Judge Klein's decision, then, Spenharts must run the table on all three issues. It must show not only that Judge Klein clearly erred in concluding, as a matter of fact, that the agreement between the pension fund and Spenharts was not executory and subject to Section 365, which was the exclusive subject of Mr. Tallarico's presentation on the top side of today's argument, but it must also show that an agreement intended to accommodate Spenharts' constrained financial circumstances and to permit it to remain in business was not a financial accommodation under Section 365c2, and Spenharts must also show that the Bankruptcy Court had the power to issue a declaration as to the validity of the underlying contract, even on summary proceedings initiated by its motion under Section 365. We don't believe that Spenharts can succeed on any of these three gambits, let alone all of them, but I would just emphasize for purposes of the Court that even if Mr. Tallarico were correct that Judge Klein's decision as to the executory character of the underlying contract were inaccurate or clear error or somehow a danger to this circuit's precedent, the decision may nonetheless be affirmed on the alternative grounds identified in Judge Klein's underlying decision, namely, specifically, that the contract constituted a financial accommodation or that the declaration on which U.S.B. conditioned its acceptance of an assignment of that agreement was unavailable on the summary proceedings initiated under Section 365. As to the financial accommodation… Can it ever be an executory contract? Yes, it absolutely can be an executory contract, Judge Brand, where there is some non-conditional obligation on behalf of the creditor. Here, however, the obligation of the creditor was entirely conditioned on the full performance of Spenharts' contractual obligations, and in addition, as Judge Gann pointed out in his questioning of Mr. Tallarico, it's also the case that the liabilities here were uncontested, and so there was nothing given up by the pension fund unless and until Spenharts fully performed its part of the agreement. That is to say that there's an independent obligation that obligated Spenharts to make monthly payments to the pension fund. That obligation derived from a separate statute, in this case, the Employee Retirement Income Security Act, just like the circumstances of the insurer in the Tax Gann case to which Judge Gann referenced and which was also cited in the underlying decision of Judge Klein. That is to say that even if the pension fund were to breach the agreement, that would not excuse Spenharts from continuing to make monthly payments of some sort to the pension fund. Here, the pension fund agreed to release Spenharts from its statutory obligations only after Spenharts had satisfied the stated conditions and made the required payments. That condition was a condition for the pension fund's sole performance under the agreement. So, it would be too broad to state that all sort of garden variety settlement agreements of this sort of issue here, excuse me, all garden variety settlement agreements wouldn't be executory, but certainly under the circumstances of this case, the agreement is an executory based on a straightforward application of the countrymen's standard. Is not an executory contract. Correct. I apologize if I misspoke. I just wanted to make sure that the isn't was isn't and not is, so that's all I was trying to clarify. Thank you. I appreciate the clarification. I'm sorry. Let me throw something out there. What I think Mr. Tlarico has heard already, and he and Mr. Jasper will be responding to this, I'm sure, in the rebuttal, is on the one side, I think we're a little bit worried that the rule that we're concerned they want us to adopt here turns all kinds of things that look like payment obligations into executory contracts. On the other side, I'm a little bit worried. I want to explore with you where the line should be in financial accommodations. I heard something that you said that was kind of intriguing, and it gets back to the conversation we had with Mr. Tlarico a moment ago, which is what was the basis for the settlement agreement. The basis was we are financially constrained. We simply can't pay you $40-some million, so therefore we'll come up with a different schedule when you pay it in this way and you can manage that. Is it the fact that the settlement was based on the inability to pay? Is that what makes this a financial accommodation? That makes it different from other agreements in your mind to simply pay money over time? In part, Your Honor, it is true that the basis of the agreement, as stated in the recitals to the agreement itself, turned on the inability of Svenharts to make monthly payments without provoking its other creditors to assert their rights, and specifically to permit Svenharts to remain in operation. That fact is recited in paragraph 8 of the agreement, which appears on appendix page 69. And importantly, the agreement states that the express purpose was not to forgive disputed, excuse me, to compromise disputed claims. Instead, it states expressly that the claims were undisputed and that the sole purpose of the agreement was to recognize the constrained financial circumstances under which Svenharts operated and to permit it to remain in business. Now, what happened here is that— So hypothetically, were the settlement agreement to be considerably less valuable at that point, were it simply to say, you know, the creditor asserts there's $40 million owing, the debtor asserts there isn't $40 million, we're going to settle at $10 million. Would that be a financial accommodation? Where one of the points of consideration on behalf of the debtor were recognizing— I'm taking that. What if it were simply, we think it's $40, we think it isn't $40, we'll settle at $15? Would that contract be a financial accommodation? In my view, Your Honor, no. Okay. Thank you. Yeah, I apologize. The important feature of this contract is not only that the debt was undisputed, but also that the pension fund took a haircut for the purpose of permitting Svenharts to retain an additional $150,000 plus per month for the purposes of spending on its operations to remain in business. And under those circumstances, it's hard to describe it as anything but a financial accommodation that permitted Svenharts an additional $150,000 per month that he undisputedly would have owed to the pension fund. You certainly—you get the thrust of the question. I mean, it's sort of the other side of the question, which is, you know, what are the limits on financial accommodation? We don't want a rule where every settlement agreement is a financial accommodation, or, you know, we'll be in just as undesirable a place as you would tell us we'd be if we took Mr. Flaherty's view of how broad integratory contracts should be. So I think there is a threading the needle aspect to this thing, and thank you for the clarification from your perspective. Yes, Your Honor, and I will emphasize that this is a peculiar contract in that regard, insofar as the sole basis for the compromise was the pension—excuse me, Svenharts' inability to pay. I'd add that it would be sort of a perverse result to permit not merely the assumption of such a financial accommodation, but also its assignment to a third party. The purpose of the financial accommodation at issue here, as paragraph 8 of the recital states, is to accommodate the peculiar financial constraints of Svenharts and to permit Svenharts to remain in business. Here, however, Svenharts proposes to assign that financial accommodation to a third party, U.S.B., that is not impecunious at all. To the contrary, it submitted a declaration in support of the underlying motion, indicating that it has over a quarter billion dollars in—excuse me, a quarter billion dollars in annual revenues, which would be more than sufficient to satisfy the obligations here. Congress sought to forestall that sort of perverse result by codifying in Subsection C-2 an exception that permits—excuse me, that excludes the assumption and assignment of such an agreement where, you know, a third party could obtain the financing or financial accommodation that it found favorable that was provided to an impecunious debtor by a creditor such as the pension fund here. So the reason why we raise that is in some regard some of the research that we have found with regard to financial accommodations required an extension of credit, some amount that was provided to the debtor on an ongoing basis, and that's what we're trying to explore here, is that why you think this is a financial accommodation contract, is because you have in some way allowed Svenharts to continue operating to retain funds that it would otherwise have to commit to the payment, and that is the effective financial condition that you provided to them, because you didn't extend money. They didn't borrow anything from you, and you aren't continuing to give them any forbearance or any other kind of agreements that would have been financial. Go ahead. I'm sorry. No, I didn't mean to cut you off here. Not at all. That's correct. Here, under the circumstances of this case, the result is analogous to as though the pension fund were providing Svenharts with $150,000 per month in additional financing, and I just emphasize that the Sunrunner case decided by the Ninth Circuit also did not provide financing directly to the debtor. Instead, it was provided to the debtor's customers, who in turn used the financing to pay the debtor. Now, this is a different case, admittedly, but there's certainly no requirement under Subsection C2 that funds flow directly from the creditor to the debtor to constitute a financial accommodation. And I'd also emphasize that as the Bankruptcy Court concluded in Boutitte, or rather emphasized in Boutitte, Subsection C2 codifies an exception for loans, that is to say the direct provision of funds, financing arrangements, and financial accommodations. Excuse me, or financial accommodations. And that disjunctive is important. As the Court in Boutitte recognized, financial accommodations must have some meaning distinct from that of loans. And so recognizing a financial accommodation under peculiar circumstances in this case is consistent with that analysis, and that's exactly what Boutitte concluded. So just to clarify, one other point is if we were to adopt your analysis with regard to the executory contract, the nature of this contract not being that executory contract, then we don't need to reach the financial accommodation issue, do we? That's precisely correct, Your Honor. There are three alternative bases for affirming, as I indicated at the outset. One is to affirm the underlying decision on the ground that Mr. Tallarico was discussing earlier, that is to say that the agreement does not constitute an executory contract. The second is even if it were an executory contract, it constitutes a financial accommodation that cannot be assumed or assigned pursuant to subsection C2. And three, the declaration of the validity of the underlying contract on which USB conditioned its acceptance of an assignment here cannot be offered under the summary of proceedings initiated under section 365. And so in USB's words, the agreement to accept that assignment and the underlying motion is moved. Any one of those three grounds would be sufficient to decide the case and object the appeal. If the court has no further questions, does the court have further questions about either any of those three grounds? Ask my colleagues? I don't. No, I'm good. Thank you. Okay, I'm fine. Thank you very much. Thanks to the court. Okay. Okay, Mr. Tallarico and Jasper, how would you like to proceed with the three minutes and 21 seconds you have left? I believe Mr. Jasper is conceding his time to me. That's correct. Apologies, Your Honors, but my internet provider has cut off service in the middle of the hearing, so I'm at a loss. Oh. Well, everybody agreed you were right. Well, thank you. I appreciate that. Okay. Contact your provider. Yeah. Okay, well, I'll be really quick, and there's two things I want to address. One, on the financial accommodation, the issues are – the argument is there's terms and discount, I believe. And so just to draw an analogy, if I'm a blueberry distributor and I have a contract with a blueberry farmer, if our terms are net 30 payment, and I need that because I need to sell my blueberries to the supermarket, so I need to get money from them so I can pay the farm, that's needed to run my business. They have to float me, if you will. But what are the terms of net 30? But if paid net 10, there's a 5% discount. There's all far-reaching implications to where it's proposed the financial accommodation go, and that's – That just proves too much in your view. Yes. Got it. Okay. So to address briefly the case Sunrunner was just brought up, that was actually – and then they would fund the debtor as a loan. So there was actual dollars going to the debtor in that from the counterparty. So that is an opposite in my view. To go back to the executory contract and what I think everyone's concerned about, especially Judge Gannon, which I can appreciate, is what happens if there is the failure of the pension fund to not provide, especially the first interim release that other cases have held, where the only obligation by the counterparty is providing the release. I mean, that is still a material obligation, and it's the entire purpose of certainly this agreement and other agreements like it, which have been ruled to be executory. But economically speaking, to Judge Gannon's point, it probably doesn't make much sense at that point for Svenharts to say, okay, we're opting out. We're blowing it up because it was a good deal. But the fact remains if they don't provide the release, what rights does Svenharts have? What can they get? They don't have the release. That was the entire purpose, and without it, yeah, that's a breach, and Svenharts could very well decide I'm not going to continue to pay for something I'm not going to get, which was the entire purpose of entering into the settlement. But isn't the release really just to prevent future litigation over this claim? In other words, all you're getting is a piece of paper you can then deliver to a court to say you can't sue us because you agreed to. Instead, you'd have to go to court and say, look, they agreed and we paid. Whether they released it or not, they can't sue us on this claim. We paid. Here's our proof. Here's the agreement, and here's our checks. You still get the same result. It doesn't have any adverse impact on you. Maybe you get attorney's fees if you have to go to court and you have to provide to prevent that if they come after you. But it doesn't change the nature of the transaction, which is unlike the case where the insurance premiums had to be paid, but there was a separate obligation to provide the kind of coverage that was at issue in TextGrant or the situation in Wagner where the duty to provide the bills of sale created an ability for the purchaser to transact afterwards that was critical to the whole purpose of the transaction. It doesn't seem to me to be present here, so I'm sorry I'm taking up your time. We're over time, but Mr. Tlarico, you get to answer the question, okay? Sure. Thank you. I'll be brief. You take as much as you need, okay? Yeah. Again, that is likely the result, but it begs the question of, well, what would happen? We could—Svenhards could go to court and say, Your Honor, they forced them to sign, or effectively they have waived because we did our part, but we don't know what the court would say. We don't know what other arguments might be made to say it should be excused. It just becomes an uncertainty. That's why you bargain for the signed release to take away that uncertainty. And without that in hand, that's a material breach. Okay. Your Honors, could I make one very quick point, very quick, 15 seconds? Well, let me ask if Mr. Siegel has any objection to you making a quick point. No objections. We're very brief. Okay. Very quickly, on financial accommodation, if the distinction the court is considering is whether or not the settlement agreement is just a haircut versus a settlement of a dispute as the liability, I don't think that's workable in practice. You're never going to know to what extent it was a haircut on credit versus liability. I mean, that's often the case. Unless the agreement says so. But, yeah, thank you. Okay. All right. Thank you for your very good arguments. This was very well presented. Thank you so much. The matter is submitted, and we'll get you a written decision as soon as we can. Thank you very much. Thank you, Your Honor. Thank you. Okay. Next matter.
judges: Lafferty, Brand, Gan